```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION
```

Ashle Nicole Speakes,              :

      Plaintiff,                  :

  v.                               :      Case No. 2:14-cv-598

                                            :      JUDGE JAMES L. GRAHAM
Commissioner of Social Security,          Magistrate Judge Kemp
                                            :

      Defendant.

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, Ashle Nicole Speakes, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for child's disability insurance benefits and supplemental security income and also for a period of disability and disability benefits.  Those applications were all filed on November 30, 2010, and alleged that Plaintiff became disabled on June 26, 2008.

After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge on January 9, 2013.  In two separate decisions dated January 24, 2013, and January 31, 2013, adjudicating all three of Plaintiff's claims, the ALJ denied benefits.  Those rulings became the Commissioner's final decisions on April 24, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on August 26, 2014.  Plaintiff filed her statement of specific errors on September 25, 2014, to which the Commissioner responded on December 30, 2014.  Plaintiff filed a reply on January 13, 2015, and the case is now ready to decide.

II. Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 22 years old at the time of the

administrative hearing and who has a high school education, testified as follows.  Her testimony appears at pages 87-112 of the administrative record.

The ALJ first asked Plaintiff about her work experience.  She said that she last worked at Burger King from July to December, 2011, and was then laid off.  She collected unemployment benefits afterward.  At the time of the hearing, she was attending the Art Institute of Cincinnati, studying fashion design.  She was living in an apartment there.

As to why she could not work, Plaintiff explained that she could not stand for long periods of time due to pain.  She described back pain associated with numbness in her legs.  Plaintiff did not have money to obtain medical treatment for her back.  Additionally, she experienced mood swings, frustration, and aggravation due to her pain.  She had been diagnosed with bipolar disorder.  She suffered from memory problems, had trouble understanding things she read, and was getting failing grades in college.

Plaintiff also said that her feet would go numb after sitting for twenty minutes.  She might be able to do a sedentary job where she could move around a bit.  At Burger King, she had no problems with customers or coworkers but some difficulty with managers.

### III.  The Medical Records

The medical records in this case are found beginning on page 461 of the administrative record.  The pertinent records - those relating to Plaintiff's statement of errors - can be summarized as follows.

In 2004, when she was sixteen, Plaintiff was admitted to Children's Hospital where she underwent a diagnostic assessment.  Her mother said that Plaintiff was depressed, irritable, and defiant and that she had recently written a suicide note.  At

that time, her school performance was poor. Her judgment and insight were described as impaired and she was rated as a high suicide risk. The report stated that Plaintiff would benefit from individual counseling. Her GAF was rated at 50. She began counseling as well as taking medication, which improved her thought processes. Subsequent testing revealed an active psychotic process and pharmacological therapy was recommended. (Tr. 461-80).

At age 17, Plaintiff was evaluated to see if she qualified for assistance from the Delaware County Board of Developmental Disabilities. The only significant problems noted during the evaluation were that she forgot to take her medications and that she was overweight. Additionally, she had problems budgeting money. She was working at the time. She was deemed ineligible for services. (Tr. 481-524).

On June 17, 2008, Dr. Weaver conducted a clinical interview for the Bureau of Disability Determination. Plaintiff reported feeling well, going to college, and not having problems. She said she had been diagnosed with ADHD. She was seeing a psychologist twice a month. Dr. Weaver thought she would need tutoring services if she were to attend college. He assessed her judgment as below average and she seemed to have poor understanding of her medical conditions, including obesity. Her full-scale IQ was measured at 84. Dr. Weaver diagnosed schizophrenia, oppositional defiant disorder, and an eating disorder. He rated her GAF at 50 plus or minus ten, and saw marked impairments in maintaining attention, pace, persistence, and concentration, as well as withstanding the stress of everyday work. She was moderately to markedly impaired in other areas. (Tr. 548-52). Dr. Williams, a state agency reviewer, disagreed, finding no marked impairments, noting that Dr. Weaver did not have a prior assessment that showed Plaintiff in the mid-range of

impairment without serious limitations. Dr. Williams thought the record suggested that Plaintiff "retains capacity for simple work tasks, routines, social exchanges, and adjustments." (Tr. 559-75). Dr. Steiger, another state agency reviewer, concurred in that analysis. (Tr. 577).

On June 24, 2010, Dr. Lteif, a child and adolescent psychiatrist, wrote a letter stating that Plaintiff had been diagnosed with schizoaffective disorder, and that she was unable to support herself and would need medication management and therapy indefinitely. (Tr. 663). That letter repeated a comment made by Aimee Moore, who was apparently Plaintiff's counselor. (Tr. 664-65). Nurse Practitioner Alley, another treating source, who had seen Plaintiff for over three years, completed a questionnaire on January 20, 2011, on which she said that Plaintiff had marked difficulty in all areas due to her schizoaffective disorder and that she would have great difficulty sustaining a regular work schedule. Nurse Alley also reported that Plaintiff had prior episodes of decompensation but had been stable in the last year and concluded that Plaintiff had only a limited ability to tolerate stress and was not capable of managing benefits. (Tr. 672-74).

On April 13, 2011, Dr. Smith, a psychologist, conducted a consultative examination. Plaintiff reported being given accommodations in school and said she had a general learning disability. She was under the care of several doctors for both physical and psychological conditions. Her activities of daily living included watching television, doing online schoolwork, taking piano lessons, attending church, lifting weights, and walking. Plaintiff reported her height as 5'1" and her weight as 327 pounds. Her thought processes were logical, coherent, and goal-directed. Her mood was normal, but she reported issues with concentration. She appeared somewhat immature. Dr. Smith

-4-

diagnosed major depression, recurrent, moderate, and borderline personality traits. She rated Plaintiff's GAF at 50-55 and reached these conclusions about Plaintiff's functioning: she could understand and apply instructions in a work setting consistent with borderline to low intellectual functioning, would have difficulty in a crowded or chaotic work environment, could relate to others if the relationships were not too demanding, and would not have any major problems coping with work stress. (Tr. 741-46).

Plaintiff received some treatment from North Central Mental Health in 2011, but discontinued treatment when she lost her insurance. Her GAF on admission to treatment was rated at 57, and she reported mood swings, depression, and difficulty making decisions. During treatment, she learned coping skills and obtained employment. (Tr. 747-51). Plaintiff was seen at the Grady Memorial Hospital emergency room in 2012 after an apparent suicide attempt, where she denied any further thoughts of self-harm and was discharged in good condition. Other than a multitude of records showing treatment for hypothyroidism and occasional complaints of back pain, there is nothing else in the medical records which appears to be pertinent to the issues raised in the Statement of Errors. There are two state agency physician reviews, done by Dr. McKee and Dr. Rosenfeld, indicating that, in their opinion, Plaintiff did not suffer from any severe physical impairments. (Tr. 122, 159-60).

### IV. The Vocational Testimony

Lynn Kaufman was the vocational expert in this case. Her testimony begins on page 112 of the administrative record.

Ms. Kaufman was asked some questions about a hypothetical person who could work at all exertional levels, who would be off task for 5% of the day, and who could not do work with production rate or pace. Ms. Kaufman said such a person could work as a

cleaner at the medium level, a packer, and a laundry worker.

A second hypothetical question was then asked, describing a person who had additional restrictions which limited the person to simple repetitive tasks, work in a low-stress environment (defined as requiring only occasional decision-making and involving only occasional changes in the work setting, frequent interaction with the public and coworkers but only occasional interaction with supervisors), and no money management.  Ms. Kaufman said that such a person could do the three jobs previously identified.  Next, she was asked her opinion about employability if the person could do all of the postural requirements of work only occasionally and, in addition, needed to take four 15-minute work breaks on top of regular work breaks.  Ms. Kaufman testified that the postural restrictions would limit the person to light work, and the work breaks would not be acceptable in an employment setting.  Also, a person missing two days per month due to pain could not hold a job.

> V.   The Administrative Law Judge's Decision

The Administrative Law Judge's two decisions appear at pages 13-27 and 31-45 of the administrative record.  The important findings in those decisions are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2012.  Next, he found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 26, 2008.  Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including a mood disorder, an attention deficit hyperactivity disorder, a schizoaffective disorder, and a borderline personality disorder.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404,

Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at all exertional levels but that she was limited to the performance of simple, routine, and repetitive tasks that are low stress in nature and that allowed her to be off task for 5% of the work day.  Those jobs also could not involve production rate or pace work, money management, more than occasional contact with supervisors, and more than frequent interaction with coworkers and the public.  The ALJ found that Plaintiff had no past relevant work, but with these restrictions, Plaintiff could do the jobs identified by the vocational expert, including cleaner, packer, and laundry worker.  The ALJ also determined that these jobs existed in significant numbers in the national, state, and regional economies.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits either on her disability or SSI claims or on her child's claim.

VI.  Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises these issues: (1) The ALJ did not consider the effects of Plaintiff's obesity on her residual functional capacity; (2) the ALJ did not properly evaluate the mental functioning opinion evidence; and (3) the ALJ did not follow Social Security Ruling 06-3p with respect to "other medical source" opinions.  Those issues are evaluated under the following legal standard.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v.

NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Obesity

There is no dispute that the medical records established that Plaintiff suffered from obesity. However, the ALJ found that condition not to be a severe impairment. Plaintiff argues, in her statement of errors, that the records show not only that Plaintiff suffered from obesity but that it limited her functioning, causing excessive daytime sleepiness and contributing to scoliosis, hypothyroidism, hypertension, and an eating disorder. She argues that even if it was not, by itself, severe, it should have been evaluated along with her other nonsevere impairments when her residual functional capacity was determined. In response, the Commissioner contends that not only do the medical records fail to show any functional impairment caused by Plaintiff's obesity, but the state agency physicians determined it not to be a severe impairment as well - in fact,

-8-

they determined, as did the ALJ, that Plaintiff had no severe physical impairments. Plaintiff's reply raises a slightly different argument, contending that the ALJ's failure to cite the applicable SSR (02-01p) anywhere in his decision constitutes a legal error which requires remand.

Addressing this last issue first, the Court of Appeals has noted that "Social Security Ruling 02-01p does not mandate a particular mode of analysis," Bledsoe v. Barnhart, 165 Fed. Appx. 408, 411 (6th Cir. Jan. 31, 2006), and has held that an ALJ may properly account for a claimant's obesity by relying on the functional capacity assessment of a physician who has taken obesity into account. See Coldiron v. Comm'r of Social Security, 391 Fed. Appx. 435, 443 (6th Cir. Aug. 12, 2010). However, this Court has held that, depending upon the facts of the case, the failure to mention obesity anywhere in the ALJ's decision can be grounds for remand, see Heighton v. Comm'r of Social Security, 2013 WL 214695, *10 (S.D. Ohio Jan. 18, 2013), adopted and affirmed 2013 WL 449893 (S.D. Ohio Feb. 6, 2013). In that case, the claimant had various impairments which could have been impacted by obesity, but the ALJ simply did not mention obesity at any stage of the analysis, and the Court found that to be reversible error. And in Smith v. Comm'r of Social Security, 2014 WL 4351517 (S.D. Ohio Sept. 2, 2014), adopted and affirmed 2014 WL 5502358 (S.D. Ohio Oct. 30, 2014), the Court also found reversible error because it was unclear if any of the physicians' reports upon which the ALJ relied actually took the claimant's obesity into account.

Here, the ALJ did discuss obesity in his step two analysis, noting that it had been diagnosed but that it was not a severe impairment. In fact, he concluded that "the objective evidence of record fails to establish that the claimant experiences any functional capacity limitations arising from any physical impairment." (Tr. 36). The ALJ examined various reports which

did not express functional limitations arising from the various physical impairments which Plaintiff claimed to suffer from, and he noted that both Dr. McKee and Dr. Rosenfeld did not consider Plaintiff's obesity to impose functional limitations. (Tr. 37). This is borne out by statements like this one from Dr. Rosenfeld: "[claimant's] obesity ... doesn't appear to cause specific [functional] limitations...." (Tr. 159). The ALJ therefore committed no error in applying SSR 02-01p, and, given that Plaintiff appears unable to identify any portion of the record suggesting that her obesity actually imposes severe physical limitations, the Court finds no merit in her first assignment of error.

### B. Weighing the Opinion Evidence

In her second statement of error, Plaintiff asserts that the ALJ's decision about the opinion evidence addressing Plaintiff's psychological impairments suffered from inconsistencies, the failure to evaluate all of the opinions of record, and from a lack of substantial evidence. In particular, she argues that the ALJ made no mention of the consultative examination performed by Dr. Smith, that the ALJ did not cite any evidence which contradicted the limitations which Dr. Weaver found to be present (and which are clearly work-preclusive), and that the ALJ inconsistently found that Plaintiff suffered from a schizoaffective disorder but did not credit evidence, including that from Nurse Practitioner Alley, about how that disorder affected Plaintiff's ability to function.

The ALJ's evaluation of the psychological opinion evidence consists of, first, a statement adopting the views of the state agency reviewers as "consistent with the greater weight of the medical evidence and also with other credible opinion evidence" (Tr. 24). Second, the ALJ discussed the opinion of Nurse Practitioner Alley at some length, giving it partial weight based on the fact that Plaintiff did have some psychologically-based

functional limitations, and noting that when Plaintiff was in compliance with her medication regime, such limitations were only mild to moderate. While that portion was deemed to be consistent with the ALJ's residual functional capacity finding, any more severe limitations were rejected on grounds that a nurse practitioner is not a "treating source" (and thus not entitled to controlling weight) or even an "acceptable medical source," and the ALJ commented that such an opinion is to be considered "only as to how it helps in the understanding of how an impairment affects the ability to work." Id.

    The ALJ next considered Dr. Ltief's assessment. He gave it no significant weight because it was not supported by the evidence, was conclusory in nature, did not cite any findings to support it, and was rendered while Plaintiff was attending college on a full-time basis while citing the fact that she was not supporting herself as evidence of a disability. (Tr. 24-25). Ms. Moore's opinion was rejected for essentially the same reasons. Finally, the ALJ also rejected Dr. Weaver's opinion as unsubstantiated by the objective evidence and as being based on Plaintiff's unsupported statements to him, which the ALJ found not to be entirely credible. (Tr. 25). The ALJ did not appear to acknowledge, in his discussion of the opinion evidence, the fact that Dr. Smith had expressed opinions as part of her consultative examination report, but he did summarize that report earlier in the administrative decision (Tr. 16-17).

    As part of her second claim of error, Plaintiff contends that the ALJ's failure to explain how Dr. Smith's report was weighed or how her opinions factored into the ALJ's decision constitutes denial of "a mandatory procedural right" and is especially troubling in a case in which "medical sources offered wildly divergent opinions pointing toward opposite outcomes ...." Reply Memorandum, Doc. 15, at 3. In response to this argument, the Commissioner points out that the state agency reviewers, Drs.

Tishler and Dietz, gave great weight to Dr. Smith's evaluation, and since the ALJ adopted their views, the ALJ implicitly gave the same weight to Dr. Smith's opinion as they had done.

It may be true that the ALJ committed a procedural error by not discussing or assigning specific weight to Dr. Smith's opinion.  However, any such error here appears to be harmless.  As the Commissioner points out, the ALJ, at least indirectly, gave great weight to the opinion of Dr. Smith, and Plaintiff has not identified any specific limitation endorsed by Dr. Smith that was not also incorporated into the ALJ's residual functional capacity finding.  See, e.g., Sneller v. Colvin, 2013 WL 5969662, *9 (N.D. Iowa Nov. 7, 2013), adopted and affirmed 2014 WL 855618 (N.D. Iowa March 5, 2014)(holding, in a similar situation, that "there is no need to remand this case so the ALJ can simply state what is obvious from his decision and the record"); see also Cunningham v. Colvin, 2014 WL 6609497, *6 (W.D.N.Y. Nov. 20, 2014)(holding that the failure to discuss the opinion of a consultative examiner was not a basis for remand when "it would not have affected the ALJ's disability determination insofar as the opinions of [the examiners] were consistent with the other evidence in the record that the ALJ discussed").  Since the ALJ credited the views of the state agency psychologists, and they credited the views of Dr. Smith, any error which occurred when the ALJ did not explicitly discuss Dr. Smith's opinion is harmless.

Plaintiff also faults the ALJ for discounting Dr. Weaver's opinion for reasons which are not supported by the record.  In particular, she argues that Dr. Weaver cited to the results of tests he performed, and not just to Plaintiff's self-report of symptoms, as the basis for his conclusions, and that the record does not, as the ALJ stated, contain any inconsistent evidence.  She further asserts that the ALJ found, as Dr. Weaver and Nurse Practitioner Alley both concluded, that Plaintiff had a

-12-

schizoaffective disorder, but since the state agency reviewers did not include this disorder in their diagnoses, the ALJ erred by relying on their functional capacity assessments.  She also points out that Nurse Practitioner Alley's evaluation is the only longitudinal assessment, and that the "snapshot" assessment done by Dr. Smith was therefore not a reliable basis on which to conclude that she had only moderate functional limitations.

These arguments do little more than to challenge the ALJ's evaluation of the medical evidence.  As the Commissioner has argued, there is evidence which contradicts the findings of both Dr. Weaver and Nurse Practitioner Alley - something Plaintiff herself appears to acknowledge when she describes this case as one involving "wildly divergent" medical opinions.  The North Central treatment notes show, at various times, that Plaintiff's conditions were responsive to treatment and that her symptoms were not particularly severe.  Dr. Smith, who was in the same position as was Dr. Weaver to evaluate Plaintiff, reached different conclusions as to her functional capacity.  The state agency reviewers had the benefit of both consultative examinations as well as treatment notes, and they (as well as the ALJ) assigned greater weight to Dr. Smith's evaluation.  As this Court has said,

> Where there are conflicting opinions from various medical sources, it is the ALJ's function to evaluate the medical evidence and determine Plaintiffs' RFC. Webb v. Comm'r of Soc. Sec., 368 F.3d 629, 633 (6th Cir. 2004)…. The Court "may not abrogate the [Commissioner's] function to evaluate and resolve conflicting medical testimony." [Elkins v. Sec'y of Health & Human Servs., 658 F.2d 437, 439 (6th Cir.1981)].

Swett v. Comm'r of Social Security, 886 F.Supp.2d 656, 660-61 (S.D. Ohio 2012).  That is the case here.  Finally, the fact that the diagnosed conditions differ somewhat depending upon which medical opinion is considered is not, in the Court's view, a

-13-

basis for reversal; "[d]isability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it." Merrill v. Colvin, 2015 WL 1637435, *6 (S.D. Ohio Apr. 13, 2015), citing Hill v. Comm'r of Soc. Sec., 560 Fed. Appx. 547, 551 (6th Cir. March 27, 2014). For these reasons, the Court finds no merit in the second assignment of error.

### C. Social Security Ruling 06-3p

Plaintiff's third statement of error relates to SSR 06-3p, which addresses opinions from "other medical sources." Plaintiff contends that the ALJ paid only lip service to this ruling and ignored its dictates when evaluating the "other source" evidence, particularly the opinion of Ms. Alley. She also argues that the ALJ mischaracterized that opinion. In response, the Commissioner argues that the ALJ discussed Ms. Alley's opinion in depth, and that the ALJ correctly cited the regulation in terms of how an ALJ is to consider the opinion of a non-medical source like Ms. Alley. The reply focuses on the fact that Ms. Alley had a longitudinal history with Plaintiff and suggests that the ALJ did not understand or account for that fact, thus violating 06-3p.

SSR 06-3p was promulgated by the Social Security Administration in order to "clarify how we consider opinions from sources who are not 'acceptable medical sources.'" It makes clear that the various factors used to evaluate medical source opinions, as listed in former 20 C.F.R. §404.1527(d)(now §1527(c)), "represent basic principles that apply to the consideration" of all types of medical and non-medical sources. Included in those basic principles is consideration of "how long the source has known and how frequently the source has seen the individual." The Ruling also states that "the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when

such opinions may have an effect on the outcome of the case."

Despite Plaintiff's argument to the contrary, the Court finds that the ALJ complied with this ruling. It is not, of course, necessary even in discussing the opinion of a treating source that the ALJ cite to each and every regulatory factor in the administrative decision so long as it is clear that the ALJ has performed the required analysis. See Francis v. Comm'r of Social Security, 414 Fed. Appx. 802, 804 (6th Cir. March 16, 2011)("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons ... for the weight ... give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis"). Here, the ALJ's decision makes clear that he understood the nature of the treating relationship between Plaintiff and Ms. Alley, and he also gave some weight to her opinion. The factors he cited for not giving it more weight - that it was not entitled to controlling weight even if uncontradicted, and the fact that the more severe limitations expressed by Ms. Alley related to times when Plaintiff's symptoms were exacerbated - find support in the record, including the North Central treatment notes. Overall, the Court finds that the ALJ did not deviate from this regulation, and that he adequately described his reasoning process with respect to the weight afforded to Ms. Alley's opinion. Under these circumstances, his treatment of that opinion does not provide a basis for reversal or remand.

## VII. Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the Defendant.

## VIII. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this

Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a _de novo_ determination of those portions  of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

    The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation _de novo_, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

                                                   <u>/s/ Terence P. Kemp</u>
                                                  United States Magistrate Judge